UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
ARRELLO BARNES,

                                        Plaintiff,

                    -against-

CARLA ROSS, SUEANN SMITH, DR. SYED
MAHMUD and ORMAN YILDIZ

                                        Defendants.
-----------------------------------------------------------x

```
╔══════════════════════════════════╗
║ USDS SDNY                          ║
║ DOCUMENT                           ║
║ ELECTRONICALLY FILED               ║
║ DOC #: _____             ║
║ DATE FILED:  4-3-14                ║
╚══════════════════════════════════╝
```

12 Civ. 1916 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

Plaintiff Arrello Barnes, who is pro se, contends that the defendants denied him

adequate mental health treatment due to his race, in violation of the Fourteenth Amendment's

guarantee of equal protection under the law.  The four defendants are mental health professionals

employed by the Office of Mental Health (the "OMH") at Sullivan Correctional Facility

("Sullivan").  Discovery in this case is closed.  Defendants move for summary judgment

pursuant to Rule 56, Fed. R. Civ. P., arguing that no reasonable jury could find in plaintiff's

favor.

For the reasons explained below, the defendants' motion is granted, and judgment

is entered in their favor.  Defendants have come forward with evidence that their diagnosis of

Barnes and their decision not to designate him for certain additional mental health programs

were based on non-discriminatory considerations.  In opposition, Barnes offers conclusory

assertions of misdiagnosis and discrimination that are unsupported by evidence, an affidavit that

contradicts his own sworn testimony, and affidavits from other Sullivan inmates that contain

vague or irrelevant assertions.  As the non-movant, Barnes has not come forward with evidence

of discrimination that would permit a reasonable jury to find in his favor.  The defendants'

motion is therefore granted.

LOCAL RULE 56.1 AND THE SUMMARY JUDGMENT RECORD.

Local Civil Rule 56.1 of this District requires a summary judgment movant to

submit a statement with numbered paragraphs setting forth "the material facts as to which the

moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  "Each

numbered paragraph in the statement of material facts set forth in the statement required to be

served by the moving party will be deemed to be admitted for purposes of the motion unless

specifically controverted by a correspondingly numbered paragraph in the statement required to

be served by the opposing party."  Local Civil Rule 56.1(c).  "Each statement by the movant or

opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement

of material fact, must be followed by citation to evidence which would be admissible, set forth as

required by Fed. R. Civ. P. 56(c)."  Local Civil Rule 56.1(d).  "A party may object that the

material cited to support or dispute a fact cannot be presented in a form that would be admissible

in evidence."  Rule 56(c)(2), Fed. R. Civ. P.  "'Therefore, only admissible evidence need be

considered by the trial court in ruling on a motion for summary judgment.'"  Presbyterian

Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quoting Raskin v.

Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

The defendants have submitted the statement required by Local Rule 56.1.

(Docket # 84.)  Pursuant to Local Civil Rule 56.2, the defendants also submitted the notice

required to a pro se party as to the requirements for opposing a motion for summary judgment,

and annexed the text of Rule 56 and Local Rule 56.1.  (Docket # 83.)

In opposition to defendants' motion, Barnes has submitted a memorandum of law that attaches thirteen exhibits. (Docket # 94.)  Barnes has not, however, submitted a statement in opposition to the defendants' Local Rule 56.1 statement.  "[W]hile a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement."  Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001).  In light of Barnes's pro se status, as well as his submission of evidence in opposition to the defendants' motion, the Court has reviewed and considered all materials submitted by Barnes.  Barnes's failure to submit a Local Rule 56.1 statement plays no role in the outcome of defendants' motion, and all reasonable inferences are drawn in Barnes's favor as the party opposing a motion for summary judgment.

Separately, Barnes has captioned his memorandum in opposition as a "Cross-Motion for Summary Judgment (Rule 56)." (Docket # 94.)  Though labeled a cross-motion, Barnes does not currently seek judgment in his own favor, and his submissions are reviewed for the purpose of opposing the defendants' motion.

BACKGROUND

In reviewing the summary judgment record, the Court views all evidence in the light most favorable to Barnes as the non-moving party, and draws all reasonable inferences in his favor.  See generally Costello v. City of Burlington, 632 F.3d 41, 45 (2d Cir. 2011)

A. Barnes's Mental Health History.

Barnes's claims are directed toward the allegedly deficient mental health treatment he received while incarcerated at Sullivan. (Def. 56.1 ¶ 1.)  According to Barnes, he has a long history of serious mental illness that required assignment to either the Behavioral

Health Unit ("BHU") or Residential Mental Health Unit ("RMHU") at Sullivan.  Section 137(6) of the New York Correction Law governs eligibility for BHU and RMHU treatment.  Barnes, who is African American, asserts that defendants, all of whom were employed in the OMH, refused to designate him to these programs based on discriminatory motives.  As evidence of the severity of his mental illness, Barnes has submitted evidence of his mental health that pre-dates his incarceration with the New York State Department of Corrections ("DOCS").

Barnes asserts that he was diagnosed with mental illness at age eleven, and has "been hearing voices" since that time.  (Barnes Mem. at 3.)  In a screening at the Elmhurst Hospital Center in August 1991, when he was approximately twelve years old, Barnes was diagnosed with "major depression & psychotic features," beliefs resembling psychosis and post-traumatic stress disorder.  (Barnes Mem. Ex. A.)  He exhibited "command type" auditory hallucinations, visual hallucinations and was prone to "screaming" without provocation.  (Barnes Mem. Ex. A.)

In March 1998, the Department of Psychiatry at the Kings County Hospital reviewed Barnes "for further observation in order to determine his fitness to proceed to court." (Barnes Mem. Ex. B.)  A written review of Barnes by Ruth Finch, M.D., stated in part:

> The defendant is charged with Murder in the second degree with acting in concert with a codefendant.  He appeared at today's interview as a rather anxious individual who seems to function on a mildly mentally retarded level stammering and stuttering.  . . . This 18-year-old young man seems to function on a mild mentally retarded level.  He was stuttering and stammering and very anxious.  He refused to answer any given questions.

(Barnes Mem. Ex. B.)  Barnes was eventually sentenced to a term of incarceration of 21-1/2 years to life for the crimes of murder, robbery and grand larceny of an automobile.  (See, e.g., Steinberg-Ross Dec. Ex. A at BARNES 000247.)

- 4 -

B.  Barnes's Mental Health Diagnoses While in DOCS Custody.

Although Barnes's claims are directed toward events that occurred at Sullivan in

2011, defendants have come forward with evidence of incidents relating to Barnes's mental

health that pre-date his assignment to Sullivan.

Barnes entered state custody in 2000.  (Def. 56.1 ¶ 9.)  For "the great majority" of

Barnes's 11 years of incarceration, he has been categorized as OMH Level 6, indicating that he

had no service needs.  (Steinberg-Ross Dec. ¶ 6.)  However, on June 10, 2003, while assigned to

the Upstate Correctional Facility, he was designated OMH Level 4 "in relation to a strange

recurring dream."  (Def. 56.1 ¶ 10.)  A staff psychologist concluded that Barnes had no treatable

disorder and that there was no need for additional OMH intervention.  (Def. 56.1 ¶ 11.)

On or about July 2, 2003, while at Upstate, Barnes threatened to commit suicide.

(Def. 56.1 ¶ 12.)  An OMH social worker concluded that his threats were not genuine and that he

was attempting to manipulate his housing situation in order to avoid double bunking.  (Def. 56.1

¶ 13.)  On July 3, 2003, Barnes "recanted all threats of self-harm and admitted that his actions

were based on his displeasure at being transferred to a double bunk cell."  (Def. 56.1 ¶ 14.)

On August 22, 2003, Barnes made "vague" threats of self-harm, but refused OMH

treatment when informed that OMH could not facilitate his transfer.  (Def. 56.1 ¶ 15.)  As

described by the defendants, Barnes's claims of depression and threats of self-harm "were based

on his statement that he had just received word that his mother had passed away.  Later,

however, it was revealed that his mother had passed away years earlier."  (Def. 56.1 ¶ 16.)

"When challenged, Plaintiff stated, 'What do I have to do to get out of this jail?'  The

psychologist concluded that his threats of self-harm were based on his desire to acquire a

transfer."  (Def. 56.1 ¶ 16.)

## C. Barnes's Conduct at Sullivan from August 2011 through October 2011.

Barnes was transferred to Sullivan on or about October 4, 2010. (Def. 56.1 ¶ 17.)
He was assigned to the Special Housing Unit (the "SHU") on or about August 11, 2011,
"following an incident involving a weapon, assault on an inmate, and gang-related activity."
(Def. 56.1 ¶ 18.)  Plaintiff asserts that he was denied Equal Protection under the law because,
once he was assigned to the SHU, the defendants refused to provide him additional mental health
treatment on the basis of his race.

All four defendants worked at Sullivan, where they were employed in the
facility's OMH. (Def. 56.1 ¶¶ 2-4.)  From July 1, 2001 through March 31, 2012, defendant
Sueann Smith was the OMH unit chief at Sullivan. (Def. 56.1 ¶ 2.)  Defendants Carla Steinberg-
Ross and Osman Yildiz were OMH social workers at Sullivan, and defendant Dr. Syed Mahmud
was an OMH psychiatrist at Sullivan. (Def. 56.1 ¶¶ 3-4.)

The OMH diagnosed Barnes with Anti-Social Personality Disorder. (Def. 56.1 ¶
56.)  The defendants do not identify the precise date and under what circumstances that this
diagnosis was first made.  The OMH never classified Barnes with "serious mental illness," a
condition that is defined by New York Corrections Law § 137(e).[1] (Def. 56.1 ¶¶ 55, 58.)  To
qualify as having a "serious mental illness," a patient must suffer from frequent episodes of
psychosis or depression, resulting in significant functional impairment involving acts of self-
harm or other behavior that severely affects the inmate's mental or physical health. (Def. 56.1 ¶
57.)

---

[1] In their submissions, the defendants frequently use the phrase "severe mental illness," when the text of section
137(e) speaks instead of programs to treat "serious mental illness."  Section 137(e)(6)(v) describes circumstances
when "a severe personality disorder" qualifies as a "serious mental illness."  It appears that defendants have used the
words "severe" and "serious" interchangeably.  While defendants' word choices are sometimes imprecise, they do
not affect the outcome of this motion.

Pursuant to OMH policy, when an inmate becomes psychiatrically unstable, unpredictable or dangerous, the inmate is transferred to a Residential Crisis Treatment Program ("RCTP") Observation Cell. (Def. 56.1 ¶ 5.) The inmate may be transferred out of an Observation Cell when 1.) the underlying crisis is resolved, 2.) a psychiatric assessment suggests that a patient is capable of receiving a lower level of care, or 3.) a patient requires a higher level of care. (Def. 56.1 ¶ 6.) The OMH has created specialized treatment regimens – the Behavioral Health Unit (the "BHU") and the Residential Mental Health Unit (the "RMHU") – for inmates with serious mental illness who also are assigned to the SHU. (Def. 56.1 ¶ 7.)

The BHU is "a residential mental health treatment unit for inmate-patients serving disciplinary sanctions who require intensive mental health services." (Lilly Dec. ¶ 5(a).) Patients designated to BHU "have a pattern of disturbed and disruptive behavior" accompanied by "violent or destructive impulses," and receive two hours of mental health services five days a week. (Lilly Dec. ¶ 5(a).) The RMHU also treats patients with mental illness who are serving disciplinary sanctions. (Lilly Dec. ¶ 5(c).) It "provides four hours daily, five days a week, of group treatment in the least restrictive setting permitted by the patient's mental health needs and safety and security concerns." (Lilly Dec. ¶ 5(c).)

On August 12, 2011, Barnes was admitted to the RCTP for observation, after stating both that "he might hurt himself" and that "he is not suicidal and does not want to kill self." (Def. 56.1 ¶¶ 19-20.) After observing Barnes, defendant Steinberg-Ross concluded that he was "inconsistent . . . impulsive, angry, demanding, unpredictable," with a history of "acting out." (Def. 56.1 ¶ 21.) As evidence of the severity of his condition, Barnes cites a screening record from that same date, which stated that Barnes "continues to present as reckless and impulsive" and suffered from an "Adjustment Disorder," but also noted that Barnes did not

- 7 -

exhibit "signs or symptoms of psychosis . . . ." (Barnes Mem. Ex. C.)  This screening record also described an incident in which Barnes claims that, while incarcerated, he "used a piece of string from a t-shirt, given to him by another inmate, to wrap around his neck and he states he tied it off at the light," and "was hanging feet off the ground" when the string broke and he fell to the floor. (Barnes Mem. Ex. C.)  The record notes that no witnesses or physical evidence were found as to this incident.  (Barnes Mem. Ex. C.)

On August 15, 2011, Barnes stated to an OMH employee, "I feel good," and that he "was never suicidal, I told you that on Friday.  You can send me back."  (Def. 56.1 ¶ 22.) Barnes was returned to the SHU, but placed back under suicide watch that same day after making new threats of self harm.  (Def. 56.1 ¶¶ 23-24.)  The next day, Barnes stated, "I'm good," asked to be returned to the SHU, and, when asked, would not explain why he was placed on suicide watch.  (Def. 56.1 ¶ 25.)  Defendant Steinberg-Ross concluded that Barnes was alert, oriented, not psychotic and "exhibited agenda driven behavior" concerning disciplinary issues. (Def. 56.1 ¶ 26.)  On August 17 and 18, Barnes maintained that he was feeling better, not suicidal and ready to return to the SHU, and Steinberg-Ross continued to observe that he exhibited no psychosis or thought disorder.  (Def. 56.1 ¶¶ 27-30.)  Steinberg-Ross later conducted a therapy session with Barnes on August 24, 2011, where he reported feeling "fine," and displayed no psychotic or suicidal symptoms.  (Def. 56.1 ¶¶ 31-32.)

According to Barnes, by this point, the defendants were aware that he suffered from mental illness so severe that he warranted placement in either the BHU or RMHU.  (Barnes Mem. at 3.)  He states that, by defendants' own accounts, he suffered from "a personality disorder" that required special placement for mentally ill inmates within the SHU.  (Barnes Mem. at 3.)  He notes that defendant Mahmud gave him a thorazine prescription, and that

because thorazine is an anti-psychotic drug, that prescription is evidence that defendants diagnosed him as psychotic. (Barnes Mem. at 6 & Barnes Mem. Ex. L & M.)

Separately, and in the same time period, as evidence that defendants failed to treat his condition with sufficient seriousness, Barnes cites to a file note dated August 25, 2011, which was written by an official at Sullivan whose signature is unintelligible and who Barnes does not identify. (Barnes Mem. Ex. E.) The file note described a call from an attorney at Disability Advocates Inc. in Albany, who received a letter "that raised concerns about [Barnes] possibly being at risk for suicide. She asks that [Barnes] be evaluated and adds that she cannot disclose the contents of the letter." (Barnes Mem. Ex. E.) The unidentified Sullivan official then summarized Barnes's mental health history. (Barnes Mem. Ex. E.)

On August 30, 2011, Barnes "reported hearing voices and made general threats of self-harm." (Def. 56.1 ¶ 33.) Barnes was then admitted to RCTP observation for "vague threats of self-harm" and reporting "voices and someone being seated in his stool," all of which occurred just prior to a scheduled disciplinary interview. (Def. 56.1 ¶ 34.) As described in the defendants' Local Rule 56.1 statement: "Defendant Steinberg-Ross concluded that the timing of this behavior strongly suggested that it was agenda-driven." (Def. 56.1 ¶ 35.) When she asked Barnes whether he was having suicidal thoughts, he responded, "I told you yesterday I am hearing voices, matter of fact, just send me back." (Def. 56.1 ¶ 36.) Steinberg-Ross believed that Barnes was giving "evasive answers" with "provocative content, refusing to specify further" about voices and suicidal thoughts. (Def. 56.1 ¶ 37.) On September 1, 2011, Barnes stated that he felt fine, was not suicidal, but still wanted help as to hearing voices. (Def. 56.1 ¶ 38.) He refused to respond to mental health services on September 2, 7, 8 or 9. (Def. 56.1 ¶ 39.)

On September 14, 2011, Barnes returned to suicide watch after making "superficial scratches behind his ears in the shower in SHU." (Def. 56.1 ¶ 42.) He was uncooperative with mental health staff during interactions with them on September 16, 19, 20 and 21. (Def. 56.1 ¶ 43.) On September 22, he stated that he was "never suicidal" and "not paranoid, no schizophrenia, not nervous," but that he needed medication. (Def. 56.1 ¶¶ 44-45.) Barnes was observed in the RCTP until October 17, 2011, when he was discharged to the SHU to address his disciplinary status. (Def. 56.1 ¶¶ 46-47.)

On October 19, 2011, contemporaneous to the hearing process for a pending disciplinary charge, Barnes made the apparently suicidal gesture of wrapping a sheet around his neck. (Def. 56.1 ¶ 48.) Defendant Yildiz stated that when Barnes was told that he was being manipulative, Barnes replied, according to Yildiz's summary, "that he wants to go back to block and complete the job he needs to do, means hang up." (Def. 56.1 ¶ 48.) Barnes stated that if returned to the SHU, he would be back under RCTP supervision that same day. (Def. 56.1 ¶ 48.)

On October 20, Barnes said that he had a plan to kill corrections officers and himself, and that he needed "to wait on the details and get artillery." (Def. 56.1 ¶ 49.) He also complained to Steinberg-Ross about the injustice of his disciplinary hearing, and Steinberg-Ross concluded that Barnes "clearly" planned to use the RCTP "as a way to avoid proceeding with his disciplinary situation." (Def. 56.1 ¶ 50.) Barnes was returned to the SHU on October 25, 2011. (Def. 56.1 ¶ 52.)

From October 25, 2011 through the commencement of this action, Barnes was treated by Sullivan's mental health professionals. (Def. 56.1 ¶¶ 52-53.) The OMH conducted daily rounds through the SHU, and plaintiff was offered at least two private interviews with a social worker each month and at least one private interview with a psychiatrist. (Steinberg-Ross

Dec. ¶ 24.)  During that time, he made no additional threats of harm against himself or others.
(Def. 56.1 ¶ 52.)

Although Barnes would later attempt to dramatically alter his testimony by way of
an errata sheet and an affidavit, he testified in his deposition that the defendants never made any
statements indicating that their diagnoses of him were based on his race.  (See Albanese Reply
Dec. Ex. A at 39 & 71.)

PROCEDURAL HISTORY.

Barnes commenced this action on March 14, 2012.  (Docket # 1.)  In addition to
Barnes himself, the Complaint identified ten other named plaintiffs.  (Docket # 1.)  The
Complaint asserted that all plaintiffs suffered from mental health problems, specifically
including suicidal tendencies.  (Docket # 1.)  It alleged that white inmates received "proper
treatment," while African American and Latino inmates were returned to their cells, where they
remained suicidal.  (Docket # 1, at 3.)  The Complaint seeks injunctive relief to require mental
health staffers "to provide mentally ill inmates with the proper mental treatment," including daily
interviews.  (Docket # 1, at 5.)  It also seeks monetary damages of $5,000 for each plaintiff
named in the Complaint.  (Docket # 1, at 5.)  Of the eleven plaintiffs listed in the caption, only
Barnes himself signed the Complaint.  (Docket # 1, at 7.)

In an Order dated June 6, 2012, Chief Judge Preska dismissed all plaintiffs except
Barnes.  (Docket # 10.)  One of the named plaintiffs expressly stated that he did not wish to be a
party to the action, one was deceased and the remaining eight either elected not to respond to
Court orders or attempts to contact them resulted in returned mail.  (Docket # 10.)

On June 13, 2012, the action was reassigned to the undersigned.  (Docket # 11.)
The defendants filed a motion to dismiss the case pursuant to Rule 12(b)(6), Fed. R. Civ. P.

(Docket # 34.)  In a Memorandum and Order dated February 20, 2013, this Court dismissed plaintiff's deliberate medical indifference claim under the Eighth Amendment and dismissed all claims against one defendant, but denied the defendants' motion as to Barnes's equal protection claim.  Barnes v. Ross, 926 F. Supp. 2d 499 (S.D.N.Y. 2013).  It also concluded that the Complaint did not plausibly allege claims on behalf of other similarly situated inmates, and that to the extent the Complaint purported to bring claims on behalf of such persons, those claims were dismissed.  Id. at 505.

Defendants thereafter filed their Answer.  Discovery in this case is now complete. The defendants filed their motion for summary judgment on October 11, 2013.  (Docket # 82.)

STANDARD ON A MOTION FOR SUMMARY JUDGMENT.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  It is the initial burden of the movant to come forward with evidence on each material element of its claim or defense, sufficient to demonstrate that it is entitled to relief as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

A fact is material if it "might affect the outcome of the suit under the governing law," meaning that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986).  The Court must

- 12 -

view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, granting summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party. Costello, 632 F.3d at 45; accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986).  In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants.  Rule 56(c)(3), Fed. R. Civ. P.  In the absence of any disputed material fact, summary judgment is appropriate.  Rule 56(a), Fed. R. Civ. P.

"A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); see also Anderson, 477 U.S. at 249-50 (summary judgment "may be granted" if the opposing evidence is "merely colorable" or "not significantly probative") (citations omitted).  An opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission. Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (internal quotation marks and citation omitted).

A pro se party's submissions must be read liberally.  This is especially important in the summary judgment context, where claims are subject to final adjudication. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).  "However, at some point in a lawsuit even pro se litigants must make clear to the court their claims and the facts that they believe entitle them to specific relief.  The summary judgment stage is an appropriate juncture to identify the real issues in a case," even where a party proceeds pro se. Salahuddin v. Coughlin, 781 F.2d 24, 29 (2d Cir. 1986).

DISCUSSION

I.     Defendants Have Come Forward With Evidence that Their Assessments
       of Barnes Were Based Solely on Non-Racial Considerations, and
       <u>Defendant Has Submitted No Relevant Evidence in Opposition.</u>

       A. Defendants Have Come Forward with Evidence that Their Diagnosis
          <u>of Plaintiff Was Not Racially Motivated.</u>

"To prove a violation of the Equal Protection Clause . . . a plaintiff must

demonstrate that he was treated differently than others similarly situated as a result of intentional

or purposeful discrimination." <u>Phillips v. Girdich</u>, 408 F.3d 124, 129 (2d Cir. 2005); <u>see also</u>

<u>Brown v. City of Syracuse</u>, 673 F.3d 141, 151 (2d Cir. 2012) ("The Equal Protection Clause of

the Fourteenth Amendment is essentially a direction that all persons similarly situated should be

treated alike.") (quotation marks omitted).  For prisoners asserting an Equal Protection claim, a

plaintiff "also must show that the disparity in treatment cannot survive the appropriate level of

scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not

'reasonably related to [any] legitimate penological interests.'" <u>Phillips</u>, 408 F.3d at 129 (quoting

<u>Shaw v. Murphy</u>, 532 U.S. 223, 225 (2001)).  "The government can treat persons differently if

they are not 'similarly situated.'" <u>Yuen Jin v. Mukasey</u>, 528 F.3d 143, 158 (2d Cir. 2008)

(alteration and quotation marks omitted).

       In support of their motion for summary judgment, the defendants have come

forward with evidence that they did not assign Barnes to treatment through the BHU or the

RMHU because they concluded that he did not suffer from a "serious mental illness," as that

term is defined under New York Correction Law § 137(6).  Defendants have offered significant

evidence that, while Barnes suffered from some form of mental illness, the defendants all

concluded that he did not have a "serious mental illness" under section 137, and that assignment

to a BHU or RMHU was therefore not necessary.  Instead, defendants repeatedly concluded that

- 14 -

Barnes sought a change of his mental health classification in order to manipulate his pending disciplinary proceedings.  In opposition, Barnes has offered no relevant or admissible evidence to support his argument that the defendants had a discriminatory motivation.

Designation to a BHU or RMHU is governed by statute.  In 2008, the New York legislature amended the provision of New York Correction Law § 137 that deals with the mental health problems of inmates in placed in segregated confinement.  Section 137 states that DOCS, "in consultation with mental health clinicians, shall divert or remove inmates with serious mental illness, as defined in paragraph (e) of this subdivision, from segregated confinement, where such confinement could potentially be for a period in excess of thirty days, to a residential mental health treatment unit."  N.Y. Correction L. § 137(6)(d)(1).  Subparagraph (e), in turn, provides in part that an inmate has "serious mental illness" if:

> (i)  He or she has a current diagnosis of . . .
>
>> (A) schizophrenia (all sub-types),
>> (B) delusional disorder,
>> (C) schizophremiform disorder,
>> (D) schizoaffective disorder,
>> (E) brief psychotic disorder,
>> (F) substance-induced psychotic disorder (excluding intoxication and withdrawal),
>> (G) psychotic disorder not otherwise specified,
>> (H) major depressive disorders, or
>> (I) bipolar disorder I and II [or]
>
> . . .
>
> (v)  he or she has been diagnosed with a severe personality disorder that is manifested by frequent episodes of psychosis or depression, and results in a significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health . . . .

N.Y. Correction L. § 137(6)(e).  "The core of the new approach is the creation of residential mental health treatment units designed to provide clinically appropriate treatment for inmates."

Bonacquist, Practice Commentary, McKinney's Consolidated Laws of N.Y., Book 10B, Corrections Law, § 137 (2014 pamphlet).  "An inmate determined to be suffering from a serious mental illness must be removed to a residential health treatment unit," unless removal would be "a substantial risk" to the safety of staff or the inmate.  Id.

As this Court has already recounted in extensive detail, the defendants, after numerous interactions with Barnes, concluded that Barnes did not suffer from a "serious mental illness" that would qualify him for assignment to the BHU or RMHU.  Defendant Mahmud, a psychiatrist employed at Sullivan, states that he diagnosed Barnes with "Anti-Social Personality Disorder," which does not qualify as a "serious mental illness" under section 137 unless it is "manifested by frequent episodes of psychosis or depression . . . ."  (Mahmud Dec. ¶ 7.)  As stated in his declaration:

> I evaluated Plaintiff throughout the period in which he was in the Residential Crisis Treatment Program, from approximately August 11, 2011 through October 25, 2011, and I concluded that Plaintiff was not severely mentally ill because he did not meet these requirements.  Importantly, I observed that (i) Plaintiffs [sic] did not have a significant history of psychosis or depression; (ii) Plaintiff repeatedly stated to me that he was not suicidal and would never harm himself; and (iii) Plaintiff's acts of self-harm were not frequent or severe enough to meet the standard for a severe mental illness.

(Mahmud Dec. ¶ 8.)  Mahmud states that Barnes's threats of self-harm coincided with his scheduled disciplinary proceedings, "which strongly suggested to me that [he] had an agenda to falsify or embellish mental health symptoms to avoid his disciplinary hearing or his sentence."  (Mahmud Dec. ¶ 9.)

The other individual defendants similarly concluded that Barnes did not suffer from "serious mental illness" as defined by section 137, and believed that Barnes's statements and actions arose in reaction to his disciplinary proceedings.  Their diagnoses of Barnes are

discussed extensively in the Background section of this Memorandum and Order. As noted, pursuant to the text of section 137(6)(e)(v), a "severe personality disorder" does not qualify as a "serious mental illness" requiring treatment in a BHU or RMHU unless it "is manifested by frequent episodes of psychosis or depression, and results in a significant functional impairment involving acts of self-harm or other behavior that have a seriously adverse effect on life or on mental or physical health." Steinberg-Ross specifically notes that Barnes's claims to be suicidal were often vague, that he frequently recanted or qualified them, that they coincided with scheduled disciplinary hearings, and that his purported suicide attempts were superficial in nature. (Steinberg-Ross Dec. ¶¶ 8-22.) In their declarations, the individual defendants all state that they did not use race as a factor when evaluating the mental-health status of Barnes or any other inmate. (Steinberg-Ross Dec. ¶¶ 3-5; Smith Dec. ¶¶ 4-6; Yildiz Dec. ¶¶ 4-6; Mahmud Dec. ¶¶ 3-5.)

The Court therefore concludes that defendants have come forward with evidence that their diagnoses of the plaintiff, and whether he qualified for BHU or RMHU assignment under section 137, was based on non-discriminatory factors.

### B. In Opposition, Barnes Has Not Come Forward with Evidence that Would Permit a Reasonably Jury to Find in His Favor.

#### 1. Barnes Has Not Submitted Evidence that He Was Misdiagnosed.

In opposition to defendants' motion, Barnes has come forward with no evidence that from which a reasonable jury could infer a discriminatory motivation by the defendants. Instead, Barnes primarily challenges the accuracy of the defendants' assessments of his mental health. He states that his "diagnose [sic] does fall in the category of being placed in a MHU Program for inmates who are SHU." (Barnes Mem. at 3.)

Barnes's evidence does not support his argument that he was misdiagnosed. Barnes states in his memorandum of law that, at one time, "defendants were going to place plaintiff in a SHU, MHU program, after his screening with the BHU Director." (Barnes Mem. at 3.) Barnes cites to Exhibit E of his declaration as support for the proposition that the defendants once believed that he should have been placed in an RMHU. (Barnes Mem. at 3.) That exhibit, however, summarized the previously discussed incident when an outside attorney telephoned Sullivan to state that she received a letter concerning Barnes's mental health. (Barnes Mem. Ex. E.) The memo summarizing that call recounts Barnes's mental health history, noting, among other thing, that Barnes has denied suicidal or homicidal thoughts; that he was coherent; that his speech was clear; that his thoughts were organized and logical; that there were no "acute warning signs of imminent risk of suicide"; that he was willing to discuss medication options; that he was "calm"; and that he "denies hearing voices at this time." (Barnes Mem. Ex. E.) The exhibit does not support Barnes's contention that, at one point, defendants designated him for RMHU assignment. Similarly, Exhibit C, which Barnes also cites, stated, among other things, that as of July 23, 2012, Barnes "did not present a severe mood or thought disorder." (Barnes Mem. Ex. C.) Exhibit D, which Barnes also cites, merely contains the text of New York Correction Law § 137(6)(e).

None of the evidence that Barnes cites supports his argument that he suffered from a serious mental illness under section 137, let alone that the defendants' diagnosis of him was discriminatory.

2. <u>Barnes's Affidavits Do Not Defeat Defendants' Motion.</u>

    a. Without Offering Any Explanation, Barnes's Affidavit and <u>Errata Sheet Directly Contradict His Deposition Testimony.</u>

Barnes has submitted sworn affidavits from himself and others, which assert that defendants practiced discrimination when assigning inmates to BHU and RMHU placement. Barnes states in one affidavit that defendants Ross and Smith "told me, Black People are lying and Manipulator, who tries to Manipulate D.O.C.C.S. to get out of box time." (Barnes Mem. Ex. H.)

Barnes's affidavit at Exhibit H directly contradicts testimony that he gave in his deposition of May 23, 2013. (Albanese Reply Dec. Ex. A.) First, Barnes testified that no doctors made any discriminatory statements concerning their treatment of inmates:

> Q: Besides your having observed that white inmates were treated one way and black inmates were treated another way, did any of the doctors ever say anything to you?
>
> Barnes: If they would have said it, then it would have been in the complaint. I would have put it in the complaint. No, they never verbalized it and said, "You're black and you don't need nothing." No, they never did that. The actions spoke louder than words.

(Albanese Reply Dec. Ex. A at 39.) Later in the deposition, defendants' counsel phrased this question more broadly, and asked whether Barnes had heard <u>any</u> defendant utter a remark based on race:

> Q: Have you ever at any time heard any of the defendants make a comment about race?
>
> Barnes: I already told you that. No. Everything I put in my complaint is what I know. To say I heard them and they told me, no, they never told me anything. No, sir.

(Albanese Reply Dec. Ex. A at 71.)

- 19 -

After expressly denying that he heard any defendant utter a discriminatory comment, three months later, Barnes proposed a revision of this testimony by way of an errata sheet, which he attached to a cover letter dated August 15, 2013.  (Albanese Reply Dec. Ex. B.)  Barnes stated that his answer to the first-quoted question, in which he denied that any doctors made discriminatory comments, should be revised to state, "They said things, but I didn't put it in the complaint.  They did verbalized [sic] it by saying, 'You're black and you don't need nothing . . . .'"  (Albanese Reply Dec. Ex. B.)  Barnes submitted this errata sheet shortly after the defendants sent the Court a pre-motion letter, dated August 6, 2013, which noted that in his deposition, Barnes admitted that he had no direct evidence that treatment decisions were based on race.  (Albanese Reply Ex. C.)

Barnes offered no explanation for the proposed change.  Rule 30(e)(1)(B), Fed. R. Civ. P., permits a party or a deponent to make "changes in form or substance" to a deposition transcript and "to sign a statement listing the changes and the reasons for making them."  The proposed changes may be made within 30 days of the deponent or party being informed that a transcript is available.  Rule 30(e)(1), Fed. R. Civ. P.[2]  Both the original testimony and the errata become part of the record, but at the summary judgment stage, a district court is "on firm ground" if it does not credit an errata sheet that reflects a party's attempt to "retrieve the situation by scratching out and recanting his original testimony . . . ."  Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997).  A district court should weigh the "totality of the evidence" in considering whether the alteration to prior testimony creates an issue that must be determined by a jury.  Id. (emphasis in original); see also Margo v. Weiss, 213 F.3d 55, 60-61 (2d Cir. 2000)

---

[2] While Barnes's deposition occurred on May 23, 2013 and the errata sheet was attached to a letter dated August 15, 2013, defendants confirm that Barnes "complied with the timing requirements of FRCP 30(e) in this case."  (Reply at 7 n.3.)

("plaintiffs cannot defeat a motion for summary judgment . . . by submitting errata sheets long after their depositions were taken . . . .").

Similarly, a "'party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.'" AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 736 (2d Cir. 2010) (quoting Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir. 1991)); accord Margo, 213 F.3d at 60-61 ("plaintiffs cannot defeat a motion for summary judgment by responding with affidavits recanting that earlier testimony.").

Barnes's errata sheet, while timely, was offered only after the defendants addressed his deposition testimony in their pre-motion letter. Barnes has supplied no explanation for the revision, and the self-serving revision flatly contradicts his deposition testimony. Given the totality of the evidence, a reasonable jury could not conclude that Barnes's errata sheet raises an inference of discriminatory intent by any defendant. See generally Podell, 112 F.3d at 103.

As with the content of Barnes's errata sheet, the affidavit he submits at Exhibit H contradicts his previous, sworn testimony. He now claims in Exhibit H that Ross and Smith "told me, Black People are lying and Manipulator, who tries to Manipulate D.O.C.C.S. to get out of box time." But in his deposition, Barnes attributed no such remarks to Ross or Smith. When asked whether any defendant made a comment about race, he made this definitive statement: "I already told you that. No. Everything I put in my complaint is what I know. To say I heard them and they told me, no, they never told me anything. No, sir." (Albanese Reply Dec. Ex. A. at 71.) Because Barnes's affidavit attempts to create a material issue of fact by disputing his own prior testimony, it does not defeat defendants' summary judgment motion. AEP Energy, 727 F.3d at 736; Margo, 213 F.3d at 60.

- 21 -

   b.  Barnes's Affidavits Recounting the Comments of Two Non-
       Parties Are Inadmissible Hearsay and Do Not Defeat
       Defendants' Motion.

Barnes has submitted two additional affidavits, in which he describes remarks that were purportedly made by fellow inmates. According to Barnes, two inmates, both of whom are white, heard defendants express to discriminatory animus toward African-American inmates and favoritism toward white inmates. In one affidavit, Barnes states that a white inmate named Billy Potts told him that defendant Ross said to Potts: "I don't believe you're trying to get out of your SHU time, like the black inmates does. They think they could manipulate by playing crazy. After observing you, I can tell you agaited [sic]."[3] (Barnes Mem. Ex. I.) Barnes also describes a conversation that he had with a white inmate named Johnny Phiffer. (Barnes Mem. Ex. J.) Barnes summarizes their conversation as follows: "[Phiffer] told me, he'll be going to Marcy Hospital to get treatment, cause the defendants, Ms. Ross, Ms. Smith, Mr. Yildiz and Dr. Mahmud, all believed he needed extra treatment cause he's caucasian and doesn't have to lie to get out of his SHU time." (Barnes Mem. Ex. J.)

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4). Barnes's affidavits recounting what Potts and Phiffer told him that others had told them are pure hearsay. They are offered for the truth of their contents, not the fact that Potts or Phiffer allegedly uttered certain comments. See Rule 803(3), Fed. R. Evid. The statements of Potts and Phiffer are out-of-court

---

[3] Potts was originally listed as a plaintiff in the caption of Barnes's complaint. (Docket # 1.) The Complaint attached a sworn affidavit from Potts, in which he asserted that defendant Ross told him that he had the coping skills to deal with his mental illness and offered him monthly therapy sessions. (Docket # 1 at 8.) The affidavit did not mention any allegedly discriminatory conduct. While this case was assigned to Chief Judge Preska, Potts stated in a letter that he did not wish to be a plaintiff in this action. (Docket # 10.)

statements offered for the truth of their contents – in this case, that defendants expressed special

sympathy toward white inmates and disbelieved black inmates. They are hearsay.

A "hearsay assertion that would not be admissible if testified to at trial is not

competent material for a Rule 56 affidavit." Howley v. Town of Stratford, 217 F.3d 141, 155

(2d Cir. 2000); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999)

(disregarding portion of plaintiff's affidavit in opposition to summary judgment because his

"statement as to what he 'was told' was hearsay that would not be admissible at a trial."). The

third-hand statements recounted in Exhibit I and Exhibit J are inadmissible hearsay, and they

may not properly be considered in opposition to the defendants' motion.

> ### 3.  Other Affidavits Submitted by Barnes Do Not Defeat Defendants' Summary Judgment Motion.

In addition to his own three affidavits, Barnes has submitted affidavits from four

non-parties, all of whom purport to assert that white inmates received preferential mental health

treatment. None of these affidavits sets forth detail as to the purportedly discriminatory

treatment given to Sullivan's mentally ill inmates who were assigned to the SHU.

Thomas Trathen (Exhibit K). An affidavit of Thomas Trathen, Jr. identifies

Trathen as a white inmate "who has experienced that the incarcerated caucasians receive

favorable treatment and care by OMH while the incarcerated african americans are deterred from

receiving adequate treatment and care." (Barnes Mem. Ex. K.) Trathen states that "caucasians

receive easier and faster treatment and care within OMH programs than african americans."

(Barnes Mem. Ex. K.) No further details are provided about the nature of this purportedly

differential treatment. Trathen does not state that he has been housed at Sullivan or assigned to

the SHU, and his affidavit makes no mention any defendant to this action. His affidavit does not

defeat defendants' motion for summary judgment.

Piru Umoja (Exhibit K-B). The affidavit of Piru Umoja, who identifies himself as black, states that when he participated in a hunger strike at Sullivan, he passed out and was force fed. (Barnes Mem. Ex. K-B.) Umoja also signed a do-not-resuscitate form, which officials did not honor. (Barnes Mem. Ex. K-B.) He states that "[i]nstead of being treated for my mental health ill-ness on seeking to die," he was transferred to a different correctional facility, "while other inmates who displayed equal mental illness if not less were transferred to Marcy Mental Hospital. These inmates were white though." (Barnes Mem. Ex. K-B.) The affidavit does not specify which mental illness Umoja suffered, and does not identify any of the defendants as having been involved in his treatment. The affidavit does not set forth any information as to the status of the white inmates who were purportedly transported to Marcy Mental Hospital, except the conclusory observation that their mental illness was less severe than Umoja's own unspecified condition.

Christopher Dixon (Exhibit K-C). The affidavit of Christopher Dixon states that after he suffered from depression and attempted suicide by hanging himself from a toilet using a slip-knotted T-shirt, defendant Smith accused him of "attempting to 'manipulate the system.'" (Barnes Mem. Ex. K-C.) He adds that he "personally was lied to by Ms. Smith on a number of occasions," but does not identify the nature of the purported lies. (Barnes Mem. Ex. K-C.) Dixon states that he observed that black inmates were "treated with little to no care while the caucasian inmates were regularly shipped to the psychiatric center in marcy." (Barnes Mem. Ex. K-C.) Dixon's affidavit offers only a conclusory, generalized impression about the differential treatment between inmates. It sets forth no facts that explain whether the inmates who, he claims, received differential treatment were similarly situated. Smith is the only defendant who Dixon discusses, and the conduct that he attributes to her is not alleged to be discriminatory;

rather, Smith accused Dixon of manipulation, and Dixon accuses Smith of lying.  (Barnes Mem. Ex. K-C.)

                Ronald Brooks (Exhibit K-D).  In an affidavit, Ronald Brooks states that after he refused to eat for "31-days or so," defendant Smith refused to treat him and said he "was playing some type of game . . . ."  (Barnes Mem. Ex. K-D.)  Brooks state that he was then transferred and received "the proper treatment that I need.  The white inmates receive better treatment than African Americans, such as myself."  (Barnes Mem. Ex. K-D.)  As with Dixon, Smith is the only defendant that Brooks identifies, and he does not attribute discriminatory conduct to her.  His assertion that white inmates received differential treatment is conclusory, and he sets forth no facts that support a conclusion that similarly situated inmates received differential treatment, let alone treatment that was based on race.

                No reasonable jury considering all of the evidence proffered, including the Trathen, Umoja, Dixon and Brooks affidavits, could find in favor of Barnes.

           II.        While Defendants Have Come Forward With Some Evidence that the Mental Health Designation of Inmates Is Generally Consistent with the DOCS Population as a Whole, the Court Affords Minimal Weight to This Evidence.

                Separately, the defendants have come forward with some evidence that the racial demographics of inmates assigned to Sullivan's BHU and RMHU were, broadly speaking, consistent with the racial demographics of all male inmates housed by DOCS.

                The defendants have submitted a declaration from non-party Stephanie Lilly, who is the Acting Director of Evaluation and Research for the OMH.  (Lilly Dec. ¶ 1.)  Lilly's declaration attaches charts that were generated from OMH records at Sullivan's RCTP from July 1, 2011 through March 31, 2012; the charts summarize the demographics of inmates placed in the Sullivan RCTP.  (Lilly Dec. Ex. B & C.)  Exhibit C reflects that from July 1, 2011 through

March 31, 2012, out of the 208 inmates treated in the Sullivan RCTP, 100 (48%) were African American, 62 (30%) were Hispanic and 42 (20%) were white. (Lilly Dec. ¶ 7.) During the same time period, 39 inmates were referred to treatment through the BHU, the RMHU or the Central New York Psychiatric Center, the latter of which provides in-patient treatment to inmates who present a danger to themselves or others. (Lilly Dec. ¶¶ 5(g), 7.) Of those 39 inmates, 16 (41%) were African American, 10 (25%) were Hispanic and 12 (31%) were white. (Lilly Dec. ¶ 7.) As of January 1, 2012, the overall inmate population incarcerated by DOCS was 49.9% African American, 24.8% Hispanic and 22.6% white. (Def. Mem. at 18.) As summarized in defendants' memorandum of law, "the proportion of inmates by race in each group, despite the small sample size, is within 10% of the overall statistics for male inmates as of January 1, 2012." (Def. Mem. at 19.)

    According to Barnes, these records were "falsified," and discovery established that "plaintiffs were not in the RCTP on those dates." (Barnes Mem. at 3.) Barnes cites to Sullivan RCTP records as evidence in support of his assertion, but, if anything, those records appear to confirm defendants' assertions concerning the racial demographics of the RCTP, the BHU and RMHU. (Barnes Mem. Exs. F, G)

    Nevertheless, the Court, on this motion, affords no weight to the defendants' evidence of the racial composition of those inmates assigned to Sullivan's BHU and RMHU. First, the defendants compare the racial composition of Sullivan's mental health programs to the DOCS male inmate population as a whole, and not to the racial composition of inmates housed at Sullivan or to those designated to the SHU at Sullivan. Barnes's claim is, after all, directed toward practices within Sullivan's SHU. A more useful comparison might have looked to the overall racial composition of Sullivan's SHU, then compared it to the racial composition of those

inmates in Sullivan's SHU who were treated in the RCTP, the BHU and the RMHU.  As it stands, the wider comparison between the mental health assignments within Sullivan's SHU and the overall DOCS population is of minimal relevance.

Second, the Court is not in a position to weigh the significance of the variation between the overall DOCS population and the inmates who received mental health assistance in the Sullivan SHU.  Defendants emphasize that "the proportion of inmates in race by each group, despite the small sample size, is within 10% of the overall statistics for male inmates as of January 1, 2012." (Def. Mem. at 19.)  Without more, the Court cannot at the summary judgment stage determine whether it is significant that, among Sullivan's inmates in the SHU who were referred to the BHU or the RMHU, 41% were African American, when 49.9% of the male prison population overseen by DOCS was African American during the same time period.  (Lilly Dec. ¶ 7 & Def. Mem. at 18.)  There is no basis from which to conclude that this 8.9% difference supports defendants' position.

Therefore, in dealing with this motion, the Court affords no weight to the defendants' demographic evidence.  Nevertheless, the defendants have come forward with other evidence that their assessments of Barnes were not motivated by race, and Barnes has not come forward with admissible evidence to the contrary.

III.     Defendants Are Entitled to Qualified Immunity.

Qualified immunity applies in "circumstances where an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' and applies 'regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) (quoting Pearson

v. Callahan, 555 U.S. 223, 231 (2009)).  The purpose of qualified immunity is "to serve the public good by shielding public officials from potentially disabling threats of liability."  Id. at 134.

   Based on this record, the individual defendants all are entitled to qualified immunity.  No reasonable jury could conclude that Barnes had a clearly established statutory or constitutional right to be assigned to the BHU or RMHU based on the defendants' diagnosis of a personality disorder that did not include psychosis or depression.  See generally id. at 134-35.  The record would not support the requisite factual finding that defendants were objectively unreasonable to assign Barnes to an RCTP observation cell, as opposed to providing him the additional treatment that he claims was necessary.

   Qualified immunity provides a separate and independent basis to grant the defendants' motion for summary judgment.

CONCLUSION

   The defendants' motion for summary judgment is GRANTED.  (Docket # 82.)  The Clerk is directed to terminate the motion and enter judgment for the defendants.

   This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and in forma pauperis status is denied for purpose of an appeal.  See Coppedge v. United States, 369 U.S, 438, 444-45 (1962).

   SO ORDERED.

            P. Kevin Castel
           United States District Judge

Dated: New York, New York
   April 3, 2014